Michael PAPRSKAR, Appellant,

v.

The STATE of Texas, Appellee.

No. 44447.

Court of Criminal Appeals of Texas.

June 7, 1972.

Rehearing Denied Oct. 11, 1972.

Aultman & Riley by Randell C. Riley, Fort Worth, for appellant.

Frank Coffey, Dist. Atty., John Brady and R. J. Adcock, Asst. Dist. Attys., Fort Worth, and Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction as a principal to the offense of murder where the jury assessed the death penalty.

At the outset we are confronted with the most serious question in the case. The appellant complains of the admission into evidence of certain items seized as a result of a warrantless search of his residence and place of business after his expressed refusal to consent. Appellant contends his rights under the Fourth and Fourteenth Amendments to the United States Constitution and the provisions of Article I, § 9, Texas Constitution, Vernon's Ann.St. were violated. See also Article 38.23, Vernon's Ann.C.C.P.

The State relies primarily upon the written consent to search executed by appellant's wife. Appellant urges that such consent, given out of his presence, was not valid, and further that such consent was the result of coercion and duress.

The indictment charged the appellant with the murder of Daniel Ramirez, Jr., on January 20, 1970, "by shooting him with a gun." The evidence showed the victim was four years old.

On the night of January 20, 1970, Fort Worth police officers investigating a car left parked on the parking lot of a shopping center discovered the body of the alleged victim in the vehicle. There were no keys in the car but a set of jumper wires was found under the hood. Noting a pool of blood near the trunk, assistance was summoned, the trunk forced, and the bodies of Daniel Ramirez, Sr., and his brother, Sammy Ramirez, were discovered therein. All three victims were shown to have died as a result of multiple gunshot wounds.

As a result of information received from Bobby Carpenter approximately 40 armed officers assembled at the Police Training Academy in Fort Worth early on the morning of January 29, 1970. Assistant District Attorney John Brady was present.

A Justice of the Peace was summoned. He issued felony arrest warrants for the appellant, appellant's wife, Harrell and Danny Anderson, and a white male named "Limpy", later shown by the evidence to be Eddie Miller. The Justice of the Peace was not asked to issue any search warrants, but was asked to stand by since he had a police radio in his car. Separate written consent to search forms were prepared for the appellant and his wife by Prosecutor Brady. Different officers were given these forms and assigned the task of obtaining such consent from either the husband or wife.

At approximately 7 a. m. just "at the break of day" appellant's residence and motorcycle shop at 2010 Belle Street in Fort Worth was completely surrounded by the officers. Officer J. C. Williams then went to a nearby phone booth and called the appellant telling him the place was surrounded and to come out with his hands up.

The appellant, age 28, came out with his hands up. He was followed by another individual. Two others came out shortly thereafter. The record does not identify them. Appellant's wife was arrested inside the house. It was shown that appellant, his wife, the two Anderson brothers, John Lightsey and his girl friend were taken into custody. "Limpy" Miller was later arrested at another time and place the same day.

After all the occupants were removed from the building, except appellant's wife, she was shown to have signed a written consent to search. Thereafter, apparently pursuant to such consent, officers, from approximately 7:30 to 11 a. m. conducted a thorough search of the premises. The acid vat in the motorcycle shop was emptied. In the slush at the bottom was found a key ring and several keys, a padlock and three links of chain and "a couple of pieces of metal that appeared to have been cut up with a cutting torch."

.22 and .25 caliber ammunition was found in the living room and in a dresser. A fully loaded .22 caliber revolver behind a stereo console above the bed and a magazine to a .22 caliber weapon were also discovered. Two sets of jumper wires were located in the cycle shop.

Chemist Tullis was called and reported to the search scene. He removed a ceiling tile and found human blood thereon. He also made an examination of the floor in several places using chemicals which react to human blood. He got a positive reaction at several locations.

Officer Stewart related that prior to the search, the primary goal of the officers was to arrest the persons named in the arrest warrants and secure any weapons they might have and that their secondary goal was to find a padlock and chain which had been taken from the hood of the car in which the bodies were found and a set of keys.

One of the keys found was shown to fit and unlock a door to deceased Sammy Ramirez's home and another key fit the ignition of the car in question which was registered in the maiden name of said Sammy Ramirez's wife. The car key had been damaged by the acid and it was not used to start the automobile but it caused the buzzer to sound when the front door was left open. The chain links discovered matched those found on the car, and it was shown that Sammy Ramirez kept the hood of his car padlocked with lock and chain to prevent it from being stolen.

Some of the cut pieces of metal found in the vat were shown by the chemist's testimony to have come from a .22 caliber weapon.

The items seized in the search were used to support the State's theory of the case. Other State's evidence showed that on the

morning of January 20, 1970, Daniel Ramirez, Sr., had gone to appellant's home and cycle shop and sold him heroin in exchange for a $60.00 check and a .25 caliber pistol. The check was immediately cashed at Leonard's Department Store. The appellant got sick from the heroin and decided Ramirez had sold him "bad heroin" either diluted or cut with a substance that caused the sickness. He determined to kill Ramirez. Later in the afternoon, Ramirez and his brother, Sammy, appeared at appellant's place and requested he show them how the .25 caliber pistol operated. With such weapon, appellant shot Daniel Ramirez, Sr. and at the same time, Danny Anderson shot Sammy Ramirez with a .22 caliber weapon. While making plans to dispose of the bodies, Harrell Anderson discovered four-year old Daniel Ramirez, Jr. in the Chevrolet automobile in which the Ramirez men had arrived. It was then decided to kill the boy and Harrell Anderson shot him. The car was then driven to the parking lot where it was found.

At the hearing on the motion to suppress, appellant testified that after he received the call from Officer Williams he observed the place was surrounded by police, and he dressed, and came out with his hands up. He related he was grabbed and thrown against a car, that an officer handed him a pen and demanded he sign a consent to search, but that he refused requesting a lawyer. At this point, he claimed an officer stuck a shotgun in his face and told him if he did not sign his head would be blown off. When he again refused, he was handcuffed, forced to lie on the ground with his coat over his head and told not to breathe. Approximately 15 minutes later, he was taken downtown.

In some respects, Detective Steele corroborated appellant's testimony. He stated he handed the consent form and a pen to the appellant and the appellant refused to consent and inquired " . . . what he was being charged with." and "I told him that we had a consent form for us to search that we were going to get a Search Warrant and search the house anyway." [1] Steele revealed that the appellant responded with an obscene gesture. Steele guessed that he could have gotten a search warrant. He knew a Justice of the Peace was standing by. He acknowledged that neither he nor the other officers informed appellant of his rights. He knew that after appellant's arrest the appellant did not talk with his wife.

Steele related that he informed Prosecutor Brady of the appellant's refusal and stated, " . . . I think we was in the living room in the presence of Mrs. Paprskar when I told him." Steele did not know whether she heard what was said, but he acknowledged that at the time, appellant was "outside." The record does not reflect whether the consent form had been signed at this time.

Bonnie Paprskar, age 26, who weighed 103 pounds, testified that her husband, the appellant, told her the police had called and they were "to go out with our hands up." She dressed and went to the bathroom to brush her teeth when an officer yelled, "Here is another one," and " . . . drug me out of the bathroom and slung me across the kitchen" (12 or 14 ft.). She stumbled but did not fall. Another officer then caught her arm, pulled her into the living room and pushed her into a chair. She testified there were 20 or more officers in the room, armed with pistols and shotguns, formed in a semi-circle around her. Some of the shotguns were pointed at her. She related that one officer handed her a "search paper" and told her she had to sign it; that she asked to see her husband "because I didn't know what to do about it." The request was refused. She testified she " . . . begged them to let me talk to him" but each request was refused and "[t]hey wouldn't tell me why I

1. Steele later testified he told the appellant " . . . we would get a Search Warrant if he refused."

couldn't see him"; that she "was scared to death," trembling, almost in tears.

Appellant's wife also related the officer who handed her the paper said that she had to sign or they were going to tear the place up, and then she added, "They told me that I might as well sign the paper because the judge was just down the street and if I didn't sign the paper they were going to tear the place up anyway if they had to get the search paper from him."

She further testified that no one told her she did not have to consent to the search, that she had the right to refuse, or otherwise warned her of her rights.

She admitted she signed the instrument, but stated, "I was afraid not to sign."

When Jim Greener, District Attorney's investigator, was brought into the courtroom, she identified him as the officer who "slung" her across the kitchen. He was not called to refute her testimony.

Officer J. C. Williams related he first saw Bonnie Paprskar in the bathroom that morning and observed that another officer took her by the arm but he did not notice the manner in which the officer handled her thereafter.

Lieutenant Oliver Ball testified he first observed Mrs. Paprskar seated in a living room chair; that he approached, laid his double-barrelled shotgun on the floor, pulled the pre-prepared consent to search form from his pocket and asked her to sign it explaining that she did not have to sign. He did not mention her right to demand a search warrant nor hear anyone else so advise her.

He related she read the instrument aloud and while she was doing so Assistant District Attorney Brady came into the room and commenced to converse with her; that a 10 to 15 minute conversation ensued before she signed the instrument. He denied she said anything "to him" about wanting to talk to her husband before signing. Ball testified she "showed no fear," was not hysterical, crying or upset, but added, ". . . I don't imagine she would be real calm but she cooperated real well with me."

He related there were no threats or violence of any kind and stated, ". . . She read it, signed it and the search was on."

On cross examination, Ball admitted his principal assignment had been to get permission to search from appellant's wife, that he knew appellant was head of the household and was on the scene and available to him at the time of his effort to secure the wife's consent to search.

John Brady testified that because of officers in the doorway, he ". . . had to crowd through as a matter of fact to get into the room." He observed Mrs. Paprskar in a chair reading aloud from the consent form, and heard Lt. Ball tell her that he (Ball) would get a search warrant ". . . if she didn't want to sign it" (the consent form).

Brady testified he identified himself, emphasized she did not have to sign and if she had any doubts or reservations that he did not want her to sign. He agreed she was under arrest by virtue of the felony arrest warrant at the time and that he did not give her the Miranda warnings as a result of the arrest nor prior to obtaining the consent to search.

He related he did advise Mrs. Paprskar she had a right to a search warrant, and that he did mention the Justice of the Peace being down on the Jacksboro highway, "[i]t had something to do with the search warrant, I am sure." He did hear a discussion in her presence about the murder of the Ramirez brothers.

He denied that while he was present she requested to see her husband, but asserted that ". . . she asked if her husband could sign it and I said yes he could sign it and I said I am asking you if you want to sign and you can sign it also. That is when she said all right."

When asked why he did not tell her she could talk to her husband, Brady replied, "For the same reason I didn't tell her she could get a cup of coffee; it was irrelevant."

He did not know anything about physical abuse of the woman and testified no one threatened her in his presence; that she did not appear frightened, was not trembling or in tears, nor gave any indication of being "scared to death." She mentioned something about the place having been searched before. When he told her not to sign if she had doubts, he reached for the paper and she pulled it back and signed it.

Brady revealed his conversation with appellant's wife consumed 10 or 15 minutes before she signed and he " . . . knew everyone that had been in the building was out except Mrs. Paprskar." He testified Steele did not tell him of appellant's refusal to consent until 15 minutes after the wife had signed the consent form.

The motion to suppress was overruled and at the trial objection was addressed to the admissibility of all items discovered after the consent to search was obtained. The objections were overruled.

■ Initially, appellant contends that a wife cannot consent to the search of her husband's premises even where the consent was given without coercion. He recognizes the rule stated in Burge v. State, 443 S. W.2d 720, 722 (Tex.Cr.App.) and cases there cited, but contends the rule should be overruled or modified particularly where it is shown, as in the instant case, that the husband was not absent, but on the premises and the officers knew or should have known that he had already refused to consent to a search.[2] We need not pass upon such contention as we conclude the issue of coercion is here controlling. The consent of the wife is not valid if the consent is coerced or impliedly coerced.

Taking the testimony of appellant's wife at face value, it shows coercion if believed and does not reflect that such consent was freely and voluntarily given by a person aware of her right not to consent.

We shall examine the totality of the circumstances to determine if a valid consent was given.

The officers having obtained five felony arrest warrants did not request a search warrant or present probable cause to search appellant's premises, if any they had, to the available magistrate. And this was done even though the prosecuting attorney present testified he was aware of the holding in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), limiting the scope of the search incident to arrest. Instead, the prosecuting attorney prepared two consent to search forms, one for appellant's signature and one for his wife's. Certain officers were assigned the primary task of obtaining such consent or consents.

It is undisputed that appellant's wife was informed that the house was surrounded and they were to come out with their hands up. Her testimony that she was in the bathroom when the officers entered the house was corroborated by the State's evidence, and her testimony of physical abuse was not refuted, although the officer who she alleged committed the act was available to the State. That she was under arrest at the time by virtue of a felony arrest warrant is reflected by the State's evidence. Her claim that she repeatedly asked to talk to her husband was denied by the State's witnesses but Prosecutor Brady acknowledged she asked if the matter of consent couldn't be referred to her husband which

**2.** "The Supreme Court years ago left open the question of whether a person's spouse can consent on his behalf. (Amos v. United States, 255 U.S. 313, 317, 41 S.Ct. 266, 268, 65 L.Ed. 654). Lower court decisions are mixed but usually find consent of the spouse effective." Wright, Federal Practice and Procedure, § 669 p. 87 (1969).

is an indication of her reluctance to consent herself. Her testimony that she was not warned of her right to refuse to consent was refuted by State's witnesses though it was conceded that no "Miranda" warnings were given.[3] Appellant's wife also asserted that she was informed that if she did not consent a search warrant could be obtained and that the judge was just down the road. The State's evidence reflects that a judge was standing by to issue a search warrant if she did not want to consent and demanded a search warrant, although the basis for the probable cause for the issuance of such a warrant is not revealed by this record.[4] It is clearly evident that the purpose of obtaining the consent to search was to enable officers to search the premises for evidence to be used in connection with a murder charge against appellant and his wife and others. Appellant's wife related that she was told if she insisted upon a search warrant and the officers had to obtain one they would tear the place up. This was not expressly refuted, the State evidence reflecting only generally that no threats were used. The entire conversation terminating in the consent relied upon by the State consumed approximately 15 minutes according to the State's own evidence while Mrs. Paprskar was surrounded by armed officers.

■ The protections afforded by the Fourth Amendment and the State Constitution (Article I § 9, Texas Constitution) against unreasonable searches and seizures may, like other constitutional rights, be waived. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); 51 Tex.Jur.2d, Rev., Part 1, Searches and Seizures § 42, p. 720. By consenting to a search, an individual may waive his consti-

tutional right and dispense altogether with the necessity of a warrant.

■ The general test of a waiver of constitutional rights set forth in Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), is applicable in such situations. Johnson v. United States, 333 U.S. 10, 13, 68 S.Ct. 367, 368, 92 L.Ed. 436; United States v. Blalock, 255 F.Supp. 268 (D.C.Pa.1966), noted 1967, 27 Md.Law Rev. 209. That test is "an intentional relinquishment or abandonment of a known right of privilege." It is well established that the consent must have been given freely and voluntarily before it is deemed effective.

■■ It is equally well settled that the burden of proof by clear and convincing evidence is upon the prosecution to show that the consent was freely and voluntarily given. Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968); Frazier v. State, 119 Tex.Cr.R. 217, 43 S.W.2d 597 (1931); Scott v. State, 139 Tex.Cr.R. 210, 139 S.W.2d 787 (1940); Compton v. State, 148 Tex.Cr.R. 204, 186 S.W.2d 74 (1945). This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority. Until the burden of proof has been met, the evidence obtained in a warrantless search cannot be introduced. See Selinger v. Bigler, 377 F.2d 542 (9th Cir. 1967); United States v. Vickers, 387 F.2d 703 (4th Cir. 1967).

"Consent to a search is not to be lightly inferred. It should be shown by clear and convincing evidence, and any consent must be voluntary and neither physically nor psychologically coerced. . . . "

---

3. Although good police practice, it has been held that validity of a consent to search is not dependent upon the giving of the "Miranda" warnings. DeVoyle v. State, 471 S.W.2d 77, 80 (Tex.Cr.App.1971).

4. The rule announced in Cagle v. State, 147 Tex. 354, 180 S.W.2d 928 (1944), is to the effect that search warrants can-

not be used as a means of gaining access to a man's house or office and papers solely for the purpose of making a search to use against him in a criminal proceeding. *Cf.*, however, Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (Warrantless search made in hot pursuit).

51 Tex.Jur.2d, Rev., Part 1, Searches and Seizures § 42, p. 722.

See also Phelper v. Decker, 401 F.2d 232 (5th Cir. 1968); Am.Jur. 1st ed., Searches and Seizures § 71. A distinction is recognized between unqualified express consent and submission to the apparent authority of an officer.

In Bumper v. North Carolina, supra, the United States Supreme Court said:

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. Wren v. United States, 10 Cir., 352 F.2d 617; Simmons v. Bomar, 6 Cir., 349 F.2d 365; Judd v. United States, 89 U.S.App.D.C. 64, 190 F.2d 649; Kovach v. United States, 6 Cir., 53 F.2d 639. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority. See, e. g., Amos v. United States, 255 U.S. 313, 317, 41 S.Ct. 266, 267, 65 L.Ed. 654; Johnson v. United States, 333 U.S. 10, 13, 68 S.Ct. 367, 368, 92 L. Ed. 436; Higgins v. United States, 93 U.S.App.D.C. 340, 209 F.2d 819; United States v. Marra, D.C., 40 F.2d 271; MacKenzie v. Robbins, D.C., 248 F.Supp. 496. . . . " 391 U.S. at pp. 548–549, 88 S.Ct. at p. 1792.

■ The fact that a person is under arrest does not, in and of itself, prevent a free and voluntary consent from being given. Brown v. State, 443 S.W.2d 261 (Tex.Cr.App.1969); Weeks v. State, 417 S.W.2d 716 (Tex.Cr.App.1967), cert. den. 389 U.S. 996, 88 S.Ct. 500, 19 L.Ed.2d 494; Sikes v. State, 169 Tex.Cr.R. 443, 334 S. W.2d 440 (Tex.Cr.App.1960); 51 Tex.Jur. 2d, Rev., Part 1, Searches and Seizures § 42, p. 725.

Where, however, in addition to the fact that the consenter was under arrest at the time of an alleged voluntary consent to search other coercive factors appear, i. e., display of weapons, etc., the likelihood that consent was freely given is not strong. See Weed v. United States, 340 F.2d 827 (10th Cir. 1965).

In *Weed*, the consent was held invalid where the suspect was under arrest, was told that officers had no warrant but could get one and were exhibiting unconcealed weapons. And, in Poe v. Oklahoma City, 483 P.2d 1190, 1191 (Okl.Cr.App.1971), the defendant was arrested and removed to an adjacent parking lot and informed if he did not consent to a search of his automobile the automobile would be impounded and a search warrant obtained. The consent then given was held involuntary.

In Meredith v. Commonwealth, 215 Ky. 705, 286 S.W. 1043 (1926), officers appeared in the husband's absence and announced they had no warrant but could get one. The wife's consent, though not given under arrest, was held ineffective as a waiver of her husband's rights.

In Griffin v. State, 123 Tex.Cr.R. 233, 58 S.W.2d 528 (1933), this court held that a consent to search otherwise illegal will not be inferred from conduct of one who showed officers how to reach contraband liquor only after they had threatened to tear down the house as the threat amounted to coercion.

In the instant case, the undisputed evidence shows appellant's wife was not only under arrest, but had been physically abused and surrounded by a veritable posse of armed officers prior to the request for her consent to search. Her request to see her husband or to have the matter of consent referred to him was denied. Assuming she was informed she could refuse to consent, she was also told that if she did not consent, the officers would get a search warrant and that a Justice of the Peace was standing by on the Jacksboro Highway to do just that if necessary.

"That such an alternative allows freedom of choice is at least suspect. Compare, United States v. Baldocci, S.D.Cal., 42 F.2d 567, with, Gatterdam v. United

States, 6 Cir., 5 F.2d 673; Simmons v. Bomar, M.D.Tenn., 230 F.Supp. 226; United States v. Haas, W.D.Pa., 106 F. 2d 295." Weed v. United States, supra, footnote #2.

Under these undisputed circumstances, and during a period of drastic excitement of unconcealed weapons, the "consent" was obtained.

 We hold that from a totality of the circumstances [5] presented in the instant case, Mrs. Paprskar did not voluntarily consent to the search and that it was constitutional error to have admitted into evidence the items found in the general and exploratory search of the premises after the giving of such consent. It is evident that the introduction of such items into evidence against the appellant was clearly damaging and cannot constitute harmless constitutional error under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967), and Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). See Bumper v. North Carolina, supra.

We have considered the possibility that some of the items could have been validly seized as a result of a search incident to the arrest of the five persons named in the five felony arrest warrants and within the permissible scope of such searches as outlined in Chimel v. California, supra. The search in question occurred after the effective date of *Chimel*. Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L. Ed.2d 388 (1971); Thornton v. State, 451 S.W.2d 898 (Tex.Cr.App.1970). Even under a lawful pre-*Chimel* arrest of a suspect outside his house could never by itself justify a warrantless search inside the house. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Shipley v. California, 395 U.S. 818, 89 S.Ct. 2053, 23 L.Ed.2d 732 (1969); James v. Louisiana, 382 U.S. 36, 86 S.Ct. 151, 15 L. Ed.2d 30 (1965).

This record shows that appellant and three others were arrested outside of the house. It also shows that when the officers were obtaining consent from Mrs. Paprskar all other occupants had been removed from the house and none of the items was shown to have been found incident to the arrest of Mrs. Paprskar inside the house. It is clear that the items complained of were found by the search which followed the "consent."

For the reasons stated, the judgment is reversed and the cause remanded.

5. See State v. Witherspoon, 460 S.W.2d 281 (Mo.1970).