COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.  2-07-048-CR

 

 

JARED DWAYNE BIRMINGHAM                                             APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM
THE 396TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------








Appellant Jared Dwayne
Birmingham appeals his conviction for capital murder.  In three points, he argues that the trial
court erred by denying his motion to suppress evidence allegedly obtained
through coercion, abused its discretion by failing to make findings of fact and
conclusions of law, and that the evidence is factually insufficient to prove
that Appellant intended to cause the death of the victim.  We affirm.

                                            Background

On December 20, 2005, Syed
Sadiq and Shekhar Regmi were working at a Fina gas station and convenience
store in Arlington, Texas.  Sadiq
testified that just before his shift ended at 11:00 p.m., he was sitting on a
cabinet behind the counter, taking care of paperwork out of the view of
customers, when he heard the door open and stood up to see a masked figure
enter the store.  The man headed toward
the stockroom at the back of the store, where Regmi was working.  Sadiq started toward the stockroom door, but
then he heard a gunshot and ran and hid in a cooler.  Noise from the cooler fan prevented Sadiq
from hearing what was happening in the store. 
After four or five minutes, Sadiq looked through the cooler window, and
not seeing anyone inside the store, exited the cooler.  He called 911, then turned a corner in the
store and found Regmi lying face down on the floor in a pool of blood. 








Regmi had been shot in the
back of the head.  He later died at
Harris Hospital.  Medical examiner Nizam
Peerwani testified that Regmi was killed by a loose-contact gunshot wound,
meaning that the muzzle of the gun was no more than two inches from his
skull.  The bullet entered the back of
Regmi=s head and exited through the top of his skull.  Although the bullet did not pass through any
vital brain structures and death was not instantaneous, the trauma to the brain
was so devastating that death was inevitable. 

A time-lapse surveillance
video from the convenience store, which was admitted into evidence and shown to
the jury, shows two masked and gloved men walk into the store.  About a minute later, the victim appears on
the video, holding both hands by his head. 
One of the masked men grasps the back of the victim=s shirt in his left hand and points a revolver at the victim with his
right hand, sometimes pressing the muzzle into the victim=s hair.  The video shows the
gunman straighten his left arm, apparently pushing the victim forward, while
the gunman steps back with the pistol pointed at the victim=s head.  The victim=s hair blows forward over his headCevidently from the blast of the pistol shotCand he collapses forward into some shelving.  The gunman runs from the store before the
victim even hits the floor, with the other masked man close behind. 








Police released stills of the
video to the media in the hope of developing a lead to solve the case.  They received a tip, on the basis of which
they developed Darryl Quinones as a suspect. 
Quinones cooperated with the police and testified at trial.  Quinones testified that on the day of the
murder, Appellant and Julis Perales went to his house and asked him if he
wanted to rob someone for Christmas money. 
Quinones agreed and got into the car with the other two.  As they drove, the others told him that they
were going to rob a Fina station and talked about taking a plasma television
and some money. Appellant, who was driving, parked behind a motel near the Fina
station and sent Quinones into the store to see if it had a plasma television
and whether any police officers were in the area.  Quinones went into the store and saw a plasma
television[2]
but no police officers.  He returned to
the car and reported his findings to the others. 

Quinones testified that
Appellant and Perales put on toboggan hats. 
On the ride to the Fina station, Appellant had shown Quinones a gun but
told him it was not loaded.  But as Appellant
and Perales got out of the car, Perales said, AWatch out, it=s loaded.@  Appellant put the gun down the
front of his pants, and he and Perales walked to the Fina station.  Quinones sat in the car while they were gone.









Quinones testified that
Appellant and Perales returned five to seven minutes later.  They were running, and Appellant was
limping.  When they got in the car,
Perales said, AI think you
shot that [man] in the head.@  Appellant said, AI think I shot myself in the foot,@ and he showed Quinones a bloody hole in his shoe.  Appellant and Perales were aggravated,
scared, and angry and were struggling with each other for control of the
gun.  Appellant asked Perales why he had
dropped the television; Perales said he didn=t know.  Quinones drove the car
to his house.  When he got out of the
car, Appellant told him to be careful and not to tell his best friend what had
happened.  The next day, Appellant called
Quinones and asked him, A[D]id you
hear about some hoodlums killing somebody at a store last night?,@ and laughed about it.  The
State played portions of the Fina station=s surveillance video, and Quinones identified Appellant as the shooter
from the clothes he was wearing.  

Based on information provided
by Quinones, police obtained a warrant for Appellant=s arrest.  They arrested
Appellant in his girlfriend=s apartment.  They also found a
pistol in the apartment after Appellant told them where to look and his
girlfriend consented to a search.  The
voluntariness of Appellant=s statement regarding the gun=s location and his girlfriend=s consent to search are the subjects of Appellant=s first point, and we will discuss the relevant evidence in more
detail later in this opinion.  Detective
Kyle Dishko noticed that Appellant had an injured toe; he asked Appellant if
that was where he had shot himself during the robbery, and Appellant indicated
that it was.  Police recovered a pair of
shoes from the apartment; the left shoe had a small hole in the toe.








The grand jury indicted
Appellant for capital murder.  The State
later waived the death penalty.  In his
opening statement, Appellant=s counsel conceded that Appellant shot and killed the victim but
argued that the shooting was accidental. 
Whether Appellant intended to kill the victim was hotly contested at
trial.  

Jamie Becker, a firearms
examiner with the Tarrant County Medical Examiner=s office, testified that she matched bullet fragments found at the
crime scene to the pistol found in the apartment.  Becker explained that the pistol is a
single-action revolver, meaning that the shooter had to cock the hammer before
pulling the trigger and firing a shot. 
She testified that the force needed to pull the pistol=s trigger ranged from 3.63 to 4.53 poundsCwithin factory specifications for that modelCand that the trigger was not a Ahair trigger.@  She also testified that the hole in the shoe
seized from Appellant=s girlfriend=s apartment was a bullet hole.  

The jury determined that
Appellant did intend to kill the victim and convicted him of capital murder,
and the trial court sentenced him to life in prison.    

 

 

 








                                             Discussion

1.                 
Suppression of Evidence

In his first point, Appellant argues that the
trial court erred by denying his motion to suppress and admitting into evidence
statements Appellant made at the time of his arrest and the items seized during
the search of his girlfriend=s
apartment.

a.                  
Standard of Review








We review a trial court=s
ruling on a motion to suppress evidence under a bifurcated standard of
review.  Amador v. State, 221
S.W.3d 666, 673 (Tex. Crim. App. 2007); Guzman v. State, 955 S.W.2d 85,
89 (Tex. Crim. App. 1997).  In reviewing
the trial court=s
decision, we do not engage in our own factual review.  Romero v. State, 800 S.W.2d 539, 543
(Tex. Crim. App. 1990); Best v. State, 118 S.W.3d 857, 861 (Tex. App.CFort Worth 2003, no pet.).  The trial judge is the sole trier of fact and
judge of the credibility of the witnesses and the weight to be given their
testimony.  Wiede v. State, 214
S.W.3d 17, 24B25 (Tex.
Crim. App. 2007); State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App.
2000), modified on other grounds by State v. Cullen, 195 S.W.3d 696
(Tex. Crim. App. 2006).  Therefore, we
give almost total deference to the trial court=s
rulings on (1) questions of historical fact, even if the trial court=s determination of those facts was not
based on an evaluation of credibility and demeanor, and (2) application‑of‑law‑to‑fact
questions that turn on an evaluation of credibility and demeanor.  Amador, 221 S.W.3d at 673; Montanez
v. State, 195 S.W.3d 101, 108B09
(Tex. Crim. App. 2006); Johnson v. State, 68 S.W.3d 644, 652‑53
(Tex. Crim. App. 2002).  But when
application-of-law-to-fact questions do not turn on the credibility and
demeanor of the witnesses, we review the trial court=s
rulings on those questions de novo.  Amador,
221 S.W.3d at 673; Estrada v. State, 154 S.W.3d 604, 607 (Tex. Crim.
App. 2005); Johnson, 68 S.W.3d at 652‑53.

Stated another way, when reviewing the trial court=s ruling on a motion to suppress, we
must view the evidence in the light most favorable to the trial court=s ruling.  Wiede, 214 S.W.3d at 24; State v.
Kelly, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).  When the trial court makes explicit fact
findings, we determine whether the evidence, when viewed in the light most
favorable to the trial court=s
ruling, supports those fact findings.  Kelly,
204 S.W.3d at 818B19.  We then review the trial court=s legal ruling de novo unless its
explicit fact findings that are supported by the record are also dispositive of
the legal ruling.  Id. at 819.








We must uphold the trial court=s ruling if it is supported by the
record and correct under any theory of law applicable to the case even if the
trial court gave the wrong reason for its ruling.  State v. Stevens, 235 S.W.3d 736,
740  (Tex. Crim. App. 2007); Armendariz
v. State, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), cert. denied,
541 U.S. 974 (2004).

b.                 
Suppression Hearing Testimony

Three witnesses testified at the hearing on
Appellant=s motion
to suppress: Detective Kyle Dishko, Appellant, and Appellant=s girlfriend, Nicole Trammel.








Detective Dishko testified he obtained a warrant
for Appellant=s arrest
and located Appellant at Trammel=s
apartment.  He said that he and other
officers made contact with Trammel outside her apartment and asked her if
Appellant was inside.  She first denied
that he was in the apartment, but then admitted that he was.  Another detective asked Trammel if the
officers could enter the apartment, and she consented.  Detective Dishko, Detective Shinpaugh, and
another officer entered the apartment, found AppellantCwho
had just come out of the shower and was wearing only boxer shortsCin a bedroom, and handcuffed him.  Detective Shinpaugh, who had held Appellant
at gunpoint, holstered his weapon; Detective Dishko=s
weapon was also holstered.  They sat
Appellant on the bed, and Detective Shinpaugh told him he was under arrest for
capital murder.  Detective Dishko advised
Appellant of his Miranda rights.[3]  Detective Dishko testified that he asked
Appellant if he understood his rights and that Appellant indicated that he did
by nodding. 

Detective Dishko testified that he then asked
Appellant if he wanted to Aspeak
to me about what was going on@
and that Appellant again answered by nodding; Detective Dishko asked if he
meant Ayes,@ and Appellant said, AYes.@  Detective Dishko asked Appellant Aif the gun he used to shoot the man was
in the apartment@;
Appellant did not respond.  Detective
Dishko said that he explained to Appellant that Awe
were going to find the gun if it was in the bedroom or in the apartment and
that his girlfriend was outside and that it would look like he was cooperating
with us if he turned the gun over to us.@  Appellant did not respond, but he did ask for
some clothes.  Appellant told Detective
Dishko what clothes he wanted, and the detective got them. Detective Shinpaugh
told Appellant that Awe
were gonna find the gun anyway and he did not want us going through all his
girlfriend=s things,
and that we would possibly [obtain] a search warrant.@  Detective Dishko testified that Appellant
then said, A[Y]ou got
me, it=s under
the dresser.@  He looked under the dresser and saw a black
bag, but he did not remove it.  Detective
Dishko asked Detective Shinpaugh to help Appellant get dressed.  Meanwhile, Detective Dishko went outside to
talk to Trammel. 








Trammel was sitting in the back of a patrol car
with her roommate; a police officer was sitting in the front seat.  Detective Dishko explained that officers had
seated her in the patrol car because it was a cool day and she was wearing
shorts and because media personnel were beginning to arrive on the scene.  He told Trammel that Appellant was under
arrest for capital murder, that Appellant had said the gun used in the killing
was in her bedroom, and that the police wanted to search her bedroom for the
weapon and the clothes Appellant was wearing at the time of the killing.  Trammel said she did not have a problem with
letting the police into her apartment. 
Detective Dishko then got a consent to search form and went over it line
by line with Trammel, and she signed the form. 
Detective Dishko then went back into the apartment, removed the bag from
under the dresser, opened it, and found the pistol later determined to be the
murder weapon.  

Appellant testified that he would not have told
Detective Dishko where the gun was if the detectives had not told him that they
would get a warrant, go through Trammel=s
possessions, and find the gun anyway.  On
cross-examination, he denied having told the detectives where the gun was; he
said that they searched the room without asking and found the gun. 








Trammel testified that she read the consent form
and signed it, but she said that she would not have signed it if she had known
she did not have to. She could not recall if she merely read the consent form
to herself or if Detective Dishko explained it to her.  She said that Detective Dishko told her that
they had found the gun before he asked her to consent to the search.  On cross-examination, Trammel testified that
it was Aokay@ with her if police searched her
apartment and that her regret in having signed the consent form arose from the
inconvenience of having to testify at the suppression hearing. 

At the conclusion of the hearing, the trial court
pronounced oral findings on the record, including findings that Trammel gave
police consent to enter the apartment, that Appellant=s
statements to the detectives were voluntary, and that police located the pistol
as a result of Appellant=s
statements to them.  

c.                  
Discussion

i.                    
Appellant=s
statement regarding pistol

Appellant first contends that his statement to
Detective Dishko that Ayou
got me, [the pistol is] under the dresser@
resulted from police coercion because the police told him that it would look
like he was cooperating if he told them where the gun was and that they would
get a search warrant and Atear
up@ his girlfriend=s
possessions if he didn=t
tell them where the gun was.   








An accused=s
statement is admissible evidence if the accused made it  freely and voluntarily and without compulsion
or persuasion.  Tex. Code. Crim. Proc. Ann. art. 38.21 (Vernon 2005).  When deciding whether a statement was
voluntary, we consider the totality of the circumstances in which the statement
was obtained.  Creager v. State, 952
S.W.2d 852, 855 (Tex. Crim. App. 1997); Reed v. State, 59 S.W.3d 278,
281 (Tex. App.CFort
Worth 2001, pet. ref=d).  A confession is involuntary if circumstances
show that the defendant=s
will was Aoverborne@ by police coercion.  Creager, 952 S.W.2d at 856.  The defendant=s
will may be Aoverborne@ if the record shows that there was Aofficial, coercive conduct of such a
nature@ that a
statement from the defendant was Aunlikely
to have been the product of an essentially free and unconstrained choice by its
maker.@  Alvarado v. State, 912 S.W.2d 199, 211
(Tex. Crim. App. 1995); Frank v. State, 183 S.W.3d 63, 75 (Tex. App.CFort Worth 2005, pet. ref=d). 
An accused=s oral
statement made as a result of custodial interrogation is admissible if it
contains assertions of fact that are found to be true and that tend to
establish the guilt of the accused, such as a finding of secreted property or
the instrument with which the accused states the offense was committed.  Tex.
Code Crim. Proc. Ann. art. 38.22, ' 3(c) (Vernon 2005).  








If a promise made by a person
in authority induced a confession, then that confession is inadmissible.  Penry v. State, 903 S.W.2d 715, 748
(Tex. Crim. App.), cert. denied, 516 U.S. 977 (1995); Alvarez v.
State, 649 S.W.2d 613, 620 (Tex. Crim. App. 1982), cert. denied, 464
U.S. 849 (1983).  But before a promise
will render a confession inadmissible, the promise must be shown to have
induced the confession because it was positive for the defendant, made or
sanctioned by someone in authority, and of such an influential nature that
appellant might speak untruthfully in response. 
Muniz v. State, 851 S.W.2d 238, 254 (Tex. Crim. App.), cert.
denied, 510 U.S. 837 (1993).  In our
review, we look to whether the circumstances of the promise would reasonably
induce a defendant to admit to a crime he did not commit.  Sossamon v. State, 816 S.W.2d 340, 345
(Tex. Crim. App. 1991).  A promise to
inform the court or prosecutor that an accused was cooperative can render an
accused=s statement involuntary.  Johnson
v. State, 68 S.W.3d 644, 654B55 (Tex. Crim. App. 2002).

Here, Detective Dishko merely
represented that it would look like Appellant was cooperating if he told police
where the gun was; he did not promise or suggest leniency, nor was his
statement likely to induce an innocent person to confess to capital murder.  See Muniz, 851 S.W.2d at 254.  Thus, we hold that Detective Dishko=s representation did not render Appellant=s statement involuntary.








Appellant next argues that his
free will was overborne by Detective Shinpaugh=s statement that police@could possibly obtain a warrant@ and find the gun without Appellant=s cooperation.  In the context
of a consensual search, an otherwise voluntary consent is not vitiated by the
fact that an officer asserts that he could or would obtain a search warrant if
consent is refused.  Grant v. State,
709 S.W.2d 355, 357B58 (Tex.
App.CHouston [14th Dist.] 1986, no pet.) (citing Beaupre v. State,
526 S.W.2d 811, 815 (Tex. Crim. App.), cert. denied, 423 U.S. 1037
(1975)).  By the same token, the
voluntariness of Appellant=s statement telling Detective Dishko where to find the gun is not
vitiated by Detective Shinpaugh=s assertion that the police could get a search warrant.








Appellant relies on Paprskar
v. State for the proposition that police officers= threat to obtain a search warrant renders consent to search
involuntary, and, by analogy, rendered Appellant=s statement involuntary in this case. 
484 S.W.2d 731, 739 (Tex. Crim. App. 1972).  Paprskar is easily distinguishable
because the Atotality of
the circumstances@ in that
case was vastly different from the totality in this case.  In Paprskar, the defendant=s wife consented to a search of their home after police entered the
home, pulled her out of the bathroom, treated her roughly, dragged her into her
living room, and pushed her into a chair while twenty or more police officersCall brandishing pistols or shotguns and some pointing their shotguns
at herCcrowded into the room and formed a semicircle around her.  Id. at 734.  The officers did not warn her of her
rights.  Id. at 735.  An officer told her to sign a
consent-to-search form or they would get a warrant and Atear the place up anyway.@  Id.  She signed the form but testified that she
did so only because she was afraid not to. 
Id.  The court of criminal
appeals held that from the totality of the circumstances, her consent to search
was not voluntary.  Id. at 739.

By contrast, in this case,
after arresting Appellant, the detectives put away their weapons.  Detective Dishko warned Appellant of his
rights, and Appellant indicated that he wanted to talk to the detectives
anyway.  He was wearing only boxer
shorts, but Detective Dishko agreed to get clothes for him.  Detective Dishko described the scene as Avery quiet and low key.@  Viewing the totality of the
circumstances, we cannot say that Appellant=s statement was involuntary.

ii.                  
Trammel=s
consent to search








Appellant next contends that Trammel=s consent to the search of her
apartment was involuntary.  Under the
Fourth Amendment, a search conducted without a warrant issued on probable cause
is per se unreasonable unless it falls within one of the well‑established
exceptions to the warrant requirement. Schneckloth v. Bustamonte, 412
U.S. 218, 219, 93 S. Ct. 2041, 2043B44
(1973); Reasor v. State, 12 S.W.3d 813, 817 (Tex. Crim. App. 2000).  Consent to search is one of the well‑established
exceptions to the constitutional requirements of both a warrant and probable
cause.  Carmouche, 10 S.W.3d at
331 (citing Schneckloth, 412 U.S. at 219, 93 S. Ct. at 2043B44). 
The federal constitution requires the State to prove voluntary consent
by a preponderance of the evidence, but the Texas constitution requires proof
by clear and convincing evidence.  Id.

In Schneckloth, the United States Supreme
Court considered the definition of Avoluntary
consent@ in the
context of a search and seizure.  412
U.S. at 219, 93 S. Ct. at 2044.  A[W]hen the subject of a search is not
in custody and the State attempts to justify a search on the basis of his
consent, the Fourth and Fourteenth Amendments require that it demonstrate that
the consent was in fact voluntarily given, and not the result of duress or
coercion, express or implied.@
 Id. at 248, 93 S. Ct. at
2059.  Voluntariness is a question of
fact to be determined from the totality of the circumstances.  Id. at 249, 93 S. Ct. at 2059.








When determining voluntariness, courts consider
various factors, including whether the consenting person was in custody,
whether he was arrested at gunpoint, whether he had the option of refusing
consent, the constitutional advice given to the accused, the length of
detention, the repetitiveness of the questioning, and the use of physical
punishment.  See Reasor, 12 S.W.3d
at 818; Laney v. State, 76 S.W.3d 524, 532 (Tex. App.CHouston [14th Dist.] 2002), aff'd,
117 S.W.3d 854 (Tex. Crim. App. 2003).  A
warning that an individual does not have to consent to a search and has the
right to refuse is not required nor essential. 
Meeks v. State, 692 S.W.2d 504, 510 (Tex. Crim. App. 1985).

In this case, Trammel was not in custody, though
she was sitting in the back of a patrol car. 
Detective Dishko advised her that she was not under arrest and circled
the words AI am not
currently under arrest@
on the consent form.  Trammel did not
testify that Detective Dishko threatened or coerced her into signing the
consent to search form.  She did testify
that she would not have signed the form if she had known that she did not have
to, but she also testified that she read the form, and the form states:

$          I understand that unless I give my
consent to the search, the officer cannot search the property unless the
officer obtains a search warrant from a Judge . . . .

 

$          The officer has not told me that he
will seek a search warrant if I do not consent to the search.

 

. . . .

 

$          I understand that I can withdraw my
consent at any time. 

 








Detective Dishko testified that he went over every line of the
form with Trammel.  She testified that
she did not understand the form, but she also testified that she was a high
school graduate and was attending classes at Tarrant County College.  Trammel testified that she was Aokay@
with the search at the time and that her regret in having signed the consent
form arose from the inconvenience of having to testify at the suppression
hearing.

Deferring to the trial court=s determination of the witnesses= demeanor and credibility of the
witnesses, see Amador, 221 S.W.3d at 673, we hold
that the State proved by clear and convincing evidence that Trammel voluntarily
consented to the search of her bedroom. 
Therefore, we overrule Appellant=s first point.

2.                 
Failure to make findings of fact and conclusions of law
after suppression hearing

 








In his second point, Appellant argues that the
trial court erred by failing to make written findings of fact and conclusions
of law with respect to its rulings on Appellant=s
motion to suppress.  A trial court must
make specific findings of fact when a question is raised as to the
voluntariness of an accused=s
statement and the trial court determines that the statement was voluntarily
made.  Tex. Code Crim. Proc. Ann. art. 38.22,
' 6 (Vernon 2005).  Such findings
are mandatory even if the defendant does not object to the trial court=s failure to make them.  Urias
v. State, 155 S.W.3d 141, 142 (Tex. Crim. App. 2004).  Although section 38.22 contemplates written
findings (Athe order
[containing the findings of fact] shall be filed among the papers of the cause@), the trial court satisfies the article when it dictates findings
into the record and the reporter transcribes them and makes them part of the
record.  Murphy v. State, 112
S.W.3d 592, 601B02 (Tex.
Crim. App. 2003), cert. denied, 541 U.S. 940 (2004).  That has been done in this case.  Therefore, we overrule Appellant=s second point.  See id.

3.                 
Factual sufficiency of evidence to show intent to cause
death

 

In his final point, Appellant argues that the
evidence is factually insufficient to support the jury=s
finding that he intended to cause the victim=s
death.

a.                  
Standard of review








When reviewing the factual sufficiency of the
evidence to support a conviction, we view all the evidence in a neutral light,
favoring neither party.  Watson v.
State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); Drichas v. State,
175 S.W.3d 795, 799 (Tex. Crim. App. 2005). 
We then ask whether the evidence supporting the conviction, although
legally sufficient, is nevertheless so weak that the fact-finder=s determination is clearly wrong and
manifestly unjust or whether conflicting evidence so greatly outweighs the
evidence supporting the conviction that the fact-finder=s
determination is manifestly unjust.  Watson,
204 S.W.3d at 414B15, 417; Johnson
v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  To reverse under the second ground, we must
determine, with some objective basis in the record, that the great weight and
preponderance of all the evidence, though legally sufficient, contradicts the
verdict.  Watson, 204 S.W.3d at
417.

In determining whether the evidence is factually
insufficient to support a conviction that is nevertheless supported by legally
sufficient evidence, it is not enough that this court Aharbor
a subjective level of reasonable doubt to overturn [the] conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s
resolution of a conflict in the evidence. 
Id.  We may not simply
substitute our judgment for the fact-finder=s.  Johnson, 23 S.W.3d at 12; Cain v.
State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a
different result is appropriate, we must defer to the jury=s determination of the weight to be
given contradictory testimonial evidence because resolution of the conflict Aoften turns on an evaluation of
credibility and demeanor, and those jurors were in attendance when the
testimony was delivered.@  Johnson, 23 S.W.3d at 8.  Thus, we must give due deference to the
fact-finder=s
determinations, Aparticularly
those determinations concerning the weight and credibility of the evidence.@ 
Id. at 9.








An opinion addressing factual sufficiency must
include a discussion of the most important and relevant evidence that supports
the appellant=s
complaint on appeal.  Sims v. State,
99 S.W.3d 600, 603 (Tex. Crim. App. 2003). 
Moreover, an opinion reversing and remanding on factual insufficiency
grounds must detail all the evidence and clearly state why the finding in
question is factually insufficient and under which ground.  Goodman v. State, 66 S.W.3d 283, 287
(Tex. Crim. App. 2001); Johnson, 23 S.W.3d at 7.

b.                 
Discussion

 

Appellant spends several pages of his brief
discussing two Supreme Court casesCRing
and ApprendiCapparently
in an effort to show that the indictment in this case was deficient.  See Ring v. Arizona, 536 U.S. 584, 122
S. Ct. 2428 (2002); Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct.
2348 (2000).  Ring and Apprendi
hold that certain facts must be alleged by the State and found by the jury
beyond a reasonable doubt before punishment may be increased beyond the
statutory maximum for the crime for which the jury found the defendant
guilty.  Ring, 536 U.S. 584, 609,
122 S. Ct. 2428, 2443 (declaring unconstitutional an Arizona law that enhanced
life imprisonment to death sentence upon certain findings made solely by a
judge and not a jury); Apprendi, 530 U.S. 466, 490B92, 120 S. Ct. 2348, 2363B64 (declaring unconstitutional a New
Jersey law that enhanced punishment upon judge-made findings).








Ring, Apprendi, and their progeny
are simply inapplicable to this case. 
The indictment alleged that Appellant intentionally caused the victim=s death by shooting him with a firearm
during the course of committing or attempting to commit a robbery.  The court=s
charge tracked the indictment=s
language.  Both the indictment and the
charge set out the essential elements of capital murder.  See Tex.
Penal Code Ann. ''
19.02(b)(1) (Vernon 2003), 19.03(a)(2) (Vernon Supp. 2007).  The jury found those elements beyond a
reasonable doubt.  The statutory maximumCand mandatoryCpunishment
for capital murder when the State waives the death penalty is life imprisonment
without parole.  Id. '' 12.31(a) (Vernon Supp.
2007), 19.03(b).  Thus, the
indictment alleged, and the jury found, all of the elements necessary to impose
a mandatory life sentence, and the concerns addressed by Ring and Apprendi
play no role in this case.








We turn now to the evidence that touches upon
Appellant=s intent
to cause the victim=s
death.  In addition to the evidence
recounted earlier in this opinion, the following evidence is relevant to
intent.  Appellant presented the
testimony of Max Courtney, a forensic consultant.  Courtney testified thatCbased largely on the security camera=s depiction of the killingCAppellant=s
shooting the victim was Aconsistent
with a sympathetic trigger pull.@  He explained that sympathetic trigger pull
occurs when a person who has their finger on a gun=s
trigger accidentally pulls the trigger in response to an external stimulus such
as Astress, [a] sudden shocking event, a
bump, a distraction, or whatever.@  Courtney testified that the facts that
Appellant apparently shot himself in the foot during the attempted robbery,
which presumably was accidental and possibly another sympathetic trigger pull;[4]
was wearing gloves (which decreased his trigger finger=s
sensitivity); was looking away from the victim when he fired the fatal shot;
and killed the victim when the victim might have opened the cash register for
the robbers all support the possibility of sympathetic trigger pull.  He agreed with Jamie Becker that the force
needed to pull the gun=s
trigger was within the average range for the model of gun and that it could not
be characterized as a Alight
trigger pull.@ 








To summarize, before the jury was evidence that
Appellant entered the Fina station with the intent to commit robbery; carried a
single-action pistol of normal trigger-pull that he knew to be loaded; cocked
the hammer; pulled the trigger and shot himself in the foot, presumably on
accident; cocked the hammer again; held the pistol close to the victim=s head, at times so close that the
barrel visibly moved the victim=s
hair; pulled the trigger a second time with the muzzle within two inches of the
victim=s head,
killing the victim; and immediately sprinted out of the store before the victim=s body hit the floor.  Also before the jury was Courtney=s testimony that the fatal shot was Aconsistent with sympathetic trigger
pull.@

Considering all of the evidence in a neutral
light, we cannot say that the evidence supporting the jury=s finding that Appellant intended to
cause the victim=s death is so weak or so greatly outweighed by the conflicting evidence that
the jury=s determination is clearly wrong and manifestly unjust.  Thus, the evidence is factually sufficient to
support the finding that Appellant intended to cause the victim=s death.  See Watson,
204 S.W.3d at 414B15,
417.  We overrule Appellant=s third point.

                                             Conclusion

Having overruled all of
Appellant=s points, we
affirm the trial court=s judgment.        

 

 

ANNE GARDNER

JUSTICE

 

PANEL B:   LIVINGSTON, HOLMAN, and GARDNER, JJ.

 

DO
NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  June 26, 2008











[1]See Tex. R. App. P. 47.4.





[2]The
television was on top of a cooler where customers and store employees could
watch it.  After the attempted robbery,
police found the television broken on the floor. 





[3]See
Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).





[4]The
security video does not show Appellant shooting himself in the foot.  A chipped tile and bullet fragments found in
the store suggest that he shot himself while inside the store.  And because Appellant fled the store
immediately after shooting the victim, he must have shot himself in the foot
before he shot the victim.