

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-07-048-CR

JARED DWAYNE BIRMINGHAM                              APPELLANT

V.

THE STATE OF TEXAS                                        STATE

----------

FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant Jared Dwayne Birmingham appeals his conviction for capital murder. In three points, he argues that the trial court erred by denying his motion to suppress evidence allegedly obtained through coercion, abused its discretion by failing to make findings of fact and conclusions of law, and that

---

[1] *See* TEX. R. APP. P. 47.4.

the evidence is factually insufficient to prove that Appellant intended to cause the death of the victim.  We affirm.

## Background

On December 20, 2005, Syed Sadiq and Shekhar Regmi were working at a Fina gas station and convenience store in Arlington, Texas.  Sadiq testified that just before his shift ended at 11:00 p.m., he was sitting on a cabinet behind the counter, taking care of paperwork out of the view of customers, when he heard the door open and stood up to see a masked figure enter the store.  The man headed toward the stockroom at the back of the store, where Regmi was working.  Sadiq started toward the stockroom door, but then he heard a gunshot and ran and hid in a cooler.  Noise from the cooler fan prevented Sadiq from hearing what was happening in the store.  After four or five minutes, Sadiq looked through the cooler window, and not seeing anyone inside the store, exited the cooler.  He called 911, then turned a corner in the store and found Regmi lying face down on the floor in a pool of blood.

Regmi had been shot in the back of the head.  He later died at Harris Hospital.  Medical examiner Nizam Peerwani testified that Regmi was killed by a loose-contact gunshot wound, meaning that the muzzle of the gun was no more than two inches from his skull.  The bullet entered the back of Regmi's head and exited through the top of his skull.  Although the bullet did not pass

2

through any vital brain structures and death was not instantaneous, the trauma to the brain was so devastating that death was inevitable.

A time-lapse surveillance video from the convenience store, which was admitted into evidence and shown to the jury, shows two masked and gloved men walk into the store. About a minute later, the victim appears on the video, holding both hands by his head. One of the masked men grasps the back of the victim's shirt in his left hand and points a revolver at the victim with his right hand, sometimes pressing the muzzle into the victim's hair. The video shows the gunman straighten his left arm, apparently pushing the victim forward, while the gunman steps back with the pistol pointed at the victim's head. The victim's hair blows forward over his head—evidently from the blast of the pistol shot—and he collapses forward into some shelving. The gunman runs from the store before the victim even hits the floor, with the other masked man close behind.

Police released stills of the video to the media in the hope of developing a lead to solve the case. They received a tip, on the basis of which they developed Darryl Quinones as a suspect. Quinones cooperated with the police and testified at trial. Quinones testified that on the day of the murder, Appellant and Julis Perales went to his house and asked him if he wanted to rob someone for Christmas money. Quinones agreed and got into the car with

3

the other two. As they drove, the others told him that they were going to rob a Fina station and talked about taking a plasma television and some money. Appellant, who was driving, parked behind a motel near the Fina station and sent Quinones into the store to see if it had a plasma television and whether any police officers were in the area. Quinones went into the store and saw a plasma television[2] but no police officers. He returned to the car and reported his findings to the others.

Quinones testified that Appellant and Perales put on toboggan hats. On the ride to the Fina station, Appellant had shown Quinones a gun but told him it was not loaded. But as Appellant and Perales got out of the car, Perales said, "Watch out, it's loaded." Appellant put the gun down the front of his pants, and he and Perales walked to the Fina station. Quinones sat in the car while they were gone.

Quinones testified that Appellant and Perales returned five to seven minutes later. They were running, and Appellant was limping. When they got in the car, Perales said, "I think you shot that [man] in the head." Appellant said, "I think I shot myself in the foot," and he showed Quinones a bloody hole

---

[2] The television was on top of a cooler where customers and store employees could watch it. After the attempted robbery, police found the television broken on the floor.

4

in his shoe. Appellant and Perales were aggravated, scared, and angry and were struggling with each other for control of the gun. Appellant asked Perales why he had dropped the television; Perales said he didn't know. Quinones drove the car to his house. When he got out of the car, Appellant told him to be careful and not to tell his best friend what had happened. The next day, Appellant called Quinones and asked him, "[D]id you hear about some hoodlums killing somebody at a store last night?," and laughed about it. The State played portions of the Fina station's surveillance video, and Quinones identified Appellant as the shooter from the clothes he was wearing.

Based on information provided by Quinones, police obtained a warrant for Appellant's arrest. They arrested Appellant in his girlfriend's apartment. They also found a pistol in the apartment after Appellant told them where to look and his girlfriend consented to a search. The voluntariness of Appellant's statement regarding the gun's location and his girlfriend's consent to search are the subjects of Appellant's first point, and we will discuss the relevant evidence in more detail later in this opinion. Detective Kyle Dishko noticed that Appellant had an injured toe; he asked Appellant if that was where he had shot himself during the robbery, and Appellant indicated that it was. Police recovered a pair of shoes from the apartment; the left shoe had a small hole in the toe.

5

The grand jury indicted Appellant for capital murder. The State later waived the death penalty. In his opening statement, Appellant's counsel conceded that Appellant shot and killed the victim but argued that the shooting was accidental. Whether Appellant intended to kill the victim was hotly contested at trial.

Jamie Becker, a firearms examiner with the Tarrant County Medical Examiner's office, testified that she matched bullet fragments found at the crime scene to the pistol found in the apartment. Becker explained that the pistol is a single-action revolver, meaning that the shooter had to cock the hammer before pulling the trigger and firing a shot. She testified that the force needed to pull the pistol's trigger ranged from 3.63 to 4.53 pounds—within factory specifications for that model—and that the trigger was not a "hair trigger." She also testified that the hole in the shoe seized from Appellant's girlfriend's apartment was a bullet hole.

The jury determined that Appellant did intend to kill the victim and convicted him of capital murder, and the trial court sentenced him to life in prison.

**Discussion**

**1. Suppression of Evidence**

In his first point, Appellant argues that the trial court erred by denying his motion to suppress and admitting into evidence statements Appellant made at the time of his arrest and the items seized during the search of his girlfriend's apartment.

**a. Standard of Review**

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of

7

credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652-53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id*. at 819.

We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling. *State v. Stevens*, 235 S.W.3d 736, 740

8

(Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004).

### b.    Suppression Hearing Testimony

Three witnesses testified at the hearing on Appellant's motion to suppress: Detective Kyle Dishko, Appellant, and Appellant's girlfriend, Nicole Trammel.

Detective Dishko testified he obtained a warrant for Appellant's arrest and located Appellant at Trammel's apartment.  He said that he and other officers made contact with Trammel outside her apartment and asked her if Appellant was inside.  She first denied that he was in the apartment, but then admitted that he was.  Another detective asked Trammel if the officers could enter the apartment, and she consented.  Detective Dishko, Detective Shinpaugh, and another officer entered the apartment, found Appellant—who had just come out of the shower and was wearing only boxer shorts—in a bedroom, and handcuffed him.  Detective Shinpaugh, who had held Appellant at gunpoint, holstered his weapon; Detective Dishko's weapon was also holstered.  They sat Appellant on the bed, and Detective Shinpaugh told him he was under arrest for capital murder.  Detective Dishko advised Appellant of his *Miranda* rights.[3]

---

[3] *See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966)*.*

Detective Dishko testified that he asked Appellant if he understood his rights and that Appellant indicated that he did by nodding.

Detective Dishko testified that he then asked Appellant if he wanted to "speak to me about what was going on" and that Appellant again answered by nodding; Detective Dishko asked if he meant "yes," and Appellant said, "Yes." Detective Dishko asked Appellant "if the gun he used to shoot the man was in the apartment"; Appellant did not respond. Detective Dishko said that he explained to Appellant that "we were going to find the gun if it was in the bedroom or in the apartment and that his girlfriend was outside and that it would look like he was cooperating with us if he turned the gun over to us." Appellant did not respond, but he did ask for some clothes. Appellant told Detective Dishko what clothes he wanted, and the detective got them. Detective Shinpaugh told Appellant that "we were gonna find the gun anyway and he did not want us going through all his girlfriend's things, and that we would possibly [obtain] a search warrant." Detective Dishko testified that Appellant then said, "[Y]ou got me, it's under the dresser." He looked under the dresser and saw a black bag, but he did not remove it. Detective Dishko asked Detective Shinpaugh to help Appellant get dressed. Meanwhile, Detective Dishko went outside to talk to Trammel.

10

Trammel was sitting in the back of a patrol car with her roommate; a police officer was sitting in the front seat. Detective Dishko explained that officers had seated her in the patrol car because it was a cool day and she was wearing shorts and because media personnel were beginning to arrive on the scene. He told Trammel that Appellant was under arrest for capital murder, that Appellant had said the gun used in the killing was in her bedroom, and that the police wanted to search her bedroom for the weapon and the clothes Appellant was wearing at the time of the killing. Trammel said she did not have a problem with letting the police into her apartment. Detective Dishko then got a consent to search form and went over it line by line with Trammel, and she signed the form. Detective Dishko then went back into the apartment, removed the bag from under the dresser, opened it, and found the pistol later determined to be the murder weapon.

Appellant testified that he would not have told Detective Dishko where the gun was if the detectives had not told him that they would get a warrant, go through Trammel's possessions, and find the gun anyway. On cross-examination, he denied having told the detectives where the gun was; he said that they searched the room without asking and found the gun.

Trammel testified that she read the consent form and signed it, but she said that she would not have signed it if she had known she did not have to.

11

She could not recall if she merely read the consent form to herself or if Detective Dishko explained it to her. She said that Detective Dishko told her that they had found the gun before he asked her to consent to the search. On cross-examination, Trammel testified that it was "okay" with her if police searched her apartment and that her regret in having signed the consent form arose from the inconvenience of having to testify at the suppression hearing.

At the conclusion of the hearing, the trial court pronounced oral findings on the record, including findings that Trammel gave police consent to enter the apartment, that Appellant's statements to the detectives were voluntary, and that police located the pistol as a result of Appellant's statements to them.

## c.   Discussion

### i.    Appellant's statement regarding pistol

Appellant first contends that his statement to Detective Dishko that "you got me, [the pistol is] under the dresser" resulted from police coercion because the police told him that it would look like he was cooperating if he told them where the gun was and that they would get a search warrant and "tear up" his girlfriend's possessions if he didn't tell them where the gun was.

An accused's statement is admissible evidence if the accused made it freely and voluntarily and without compulsion or persuasion. TEX. CODE. CRIM. PROC. ANN. art. 38.21 (Vernon 2005). When deciding whether a statement was

voluntary, we consider the totality of the circumstances in which the statement was obtained. *Creager v. State,* 952 S.W.2d 852, 855 (Tex. Crim. App. 1997); *Reed v. State,* 59 S.W.3d 278, 281 (Tex. App.—Fort Worth 2001, pet. ref'd). A confession is involuntary if circumstances show that the defendant's will was "overborne" by police coercion. *Creager,* 952 S.W.2d at 856. The defendant's will may be "overborne" if the record shows that there was "official, coercive conduct of such a nature" that a statement from the defendant was "unlikely to have been the product of an essentially free and unconstrained choice by its maker." *Alvarado v. State,* 912 S.W.2d 199, 211 (Tex. Crim. App. 1995)*; Frank v. State,* 183 S.W.3d 63, 75 (Tex. App.—Fort Worth 2005, pet. ref'd). An accused's oral statement made as a result of custodial interrogation is admissible if it contains assertions of fact that are found to be true and that tend to establish the guilt of the accused, such as a finding of secreted property or the instrument with which the accused states the offense was committed. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(c) (Vernon 2005).

If a promise made by a person in authority induced a confession, then that confession is inadmissible. *Penry v.* State, 903 S.W.2d 715, 748 (Tex. Crim. App.), *cert. denied*, 516 U.S. 977 (1995); *Alvarez v. State*, 649 S.W.2d 613, 620 (Tex. Crim. App. 1982), *cert. denied*, 464 U.S. 849 (1983). But

13

before a promise will render a confession inadmissible, the promise must be shown to have induced the confession because it was positive for the defendant, made or sanctioned by someone in authority, and of such an influential nature that appellant might speak untruthfully in response. *Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App.), *cert. denied*, 510 U.S. 837 (1993). In our review, we look to whether the circumstances of the promise would reasonably induce a defendant to admit to a crime he did not commit. *Sossamon v. State*, 816 S.W.2d 340, 345 (Tex. Crim. App. 1991). A promise to inform the court or prosecutor that an accused was cooperative can render an accused's statement involuntary. *Johnson v. State*, 68 S.W.3d 644, 654–55 (Tex. Crim. App. 2002).

Here, Detective Dishko merely represented that it would look like Appellant was cooperating if he told police where the gun was; he did not promise or suggest leniency, nor was his statement likely to induce an innocent person to confess to capital murder. *See Muniz*, 851 S.W.2d at 254. Thus, we hold that Detective Dishko's representation did not render Appellant's statement involuntary.

Appellant next argues that his free will was overborne by Detective Shinpaugh's statement that police"could possibly obtain a warrant" and find the gun without Appellant's cooperation. In the context of a consensual search,

14

an otherwise voluntary consent is not vitiated by the fact that an officer asserts that he could or would obtain a search warrant if consent is refused. *Grant v. State*, 709 S.W.2d 355, 357–58 (Tex. App.—Houston [14th Dist.] 1986, no pet.) (citing *Beaupre v. State*, 526 S.W.2d 811, 815 (Tex. Crim. App.), *cert. denied*, 423 U.S. 1037 (1975)). By the same token, the voluntariness of Appellant's statement telling Detective Dishko where to find the gun is not vitiated by Detective Shinpaugh's assertion that the police could get a search warrant.

Appellant relies on *Paprskar v. State* for the proposition that police officers' threat to obtain a search warrant renders consent to search involuntary, and, by analogy, rendered Appellant's statement involuntary in this case. 484 S.W.2d 731, 739 (Tex. Crim. App. 1972). *Paprskar* is easily distinguishable because the "totality of the circumstances" in that case was vastly different from the totality in this case. In *Paprskar*, the defendant's wife consented to a search of their home after police entered the home, pulled her out of the bathroom, treated her roughly, dragged her into her living room, and pushed her into a chair while twenty or more police officers—all brandishing pistols or shotguns and some pointing their shotguns at her—crowded into the room and formed a semicircle around her. *Id.* at 734. The officers did not warn her of her rights. *Id.* at 735. An officer told her to sign a consent-to-

search form or they would get a warrant and "tear the place up anyway." *Id*. She signed the form but testified that she did so only because she was afraid not to. *Id.* The court of criminal appeals held that from the totality of the circumstances, her consent to search was not voluntary. *Id.* at 739.

By contrast, in this case, after arresting Appellant, the detectives put away their weapons. Detective Dishko warned Appellant of his rights, and Appellant indicated that he wanted to talk to the detectives anyway. He was wearing only boxer shorts, but Detective Dishko agreed to get clothes for him. Detective Dishko described the scene as "very quiet and low key." Viewing the totality of the circumstances, we cannot say that Appellant's statement was involuntary.

### ii. Trammel's consent to search

Appellant next contends that Trammel's consent to the search of her apartment was involuntary. Under the Fourth Amendment, a search conducted without a warrant issued on probable cause is per se unreasonable unless it falls within one of the well-established exceptions to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043–44 (1973); *Reasor v. State*, 12 S.W.3d 813, 817 (Tex. Crim. App. 2000). Consent to search is one of the well-established exceptions to the constitutional requirements of both a warrant and probable cause. *Carmouche*, 10 S.W.3d

at 331 (citing *Schneckloth*, 412 U.S. at 219, 93 S. Ct. at 2043–44). The federal constitution requires the State to prove voluntary consent by a preponderance of the evidence, but the Texas constitution requires proof by clear and convincing evidence. *Id.*

In *Schneckloth*, the United States Supreme Court considered the definition of "voluntary consent" in the context of a search and seizure. 412 U.S. at 219, 93 S. Ct. at 2044. "[W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." *Id*. at 248, 93 S. Ct. at 2059. Voluntariness is a question of fact to be determined from the totality of the circumstances. *Id.* at 249, 93 S. Ct. at 2059.

When determining voluntariness, courts consider various factors, including whether the consenting person was in custody, whether he was arrested at gunpoint, whether he had the option of refusing consent, the constitutional advice given to the accused, the length of detention, the repetitiveness of the questioning, and the use of physical punishment. *See Reasor*, 12 S.W.3d at 818; *Laney v. State*, 76 S.W.3d 524, 532 (Tex. App.—Houston [14th Dist.] 2002), *aff'd*, 117 S.W.3d 854 (Tex. Crim. App.

17

2003). A warning that an individual does not have to consent to a search and has the right to refuse is not required nor essential. *Meeks v. State*, 692 S.W.2d 504, 510 (Tex. Crim. App. 1985).

In this case, Trammel was not in custody, though she was sitting in the back of a patrol car. Detective Dishko advised her that she was not under arrest and circled the words "I am not currently under arrest" on the consent form. Trammel did not testify that Detective Dishko threatened or coerced her into signing the consent to search form. She did testify that she would not have signed the form if she had known that she did not have to, but she also testified that she read the form, and the form states:

- I understand that unless I give my consent to the search, the officer cannot search the property unless the officer obtains a search warrant from a Judge . . . .

- The officer has not told me that he will seek a search warrant if I do not consent to the search.

  . . . .

- I understand that I can withdraw my consent at any time.

Detective Dishko testified that he went over every line of the form with Trammel. She testified that she did not understand the form, but she also testified that she was a high school graduate and was attending classes at Tarrant County College. Trammel testified that she was "okay" with the search

18

at the time and that her regret in having signed the consent form arose from the inconvenience of having to testify at the suppression hearing.

Deferring to the trial court's determination of the witnesses' demeanor and credibility of the witnesses, *see Amador*, 221 S.W.3d at 673, we hold that the State proved by clear and convincing evidence that Trammel voluntarily consented to the search of her bedroom. Therefore, we overrule Appellant's first point.

## 2. Failure to make findings of fact and conclusions of law after suppression hearing

In his second point, Appellant argues that the trial court erred by failing to make written findings of fact and conclusions of law with respect to its rulings on Appellant's motion to suppress. A trial court must make specific findings of fact when a question is raised as to the voluntariness of an accused's statement and the trial court determines that the statement was voluntarily made. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (Vernon 2005). Such findings are mandatory even if the defendant does not object to the trial court's failure to make them. *Urias v. State*, 155 S.W.3d 141, 142 (Tex. Crim. App. 2004). Although section 38.22 contemplates written findings ("the order [containing the findings of fact] shall be filed among the papers of the cause"), the trial court satisfies the article when it dictates findings into the record and

19

the reporter transcribes them and makes them part of the record. *Murphy v. State*, 112 S.W.3d 592, 601–02 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 940 (2004). That has been done in this case. Therefore, we overrule Appellant's second point. *See id.*

3. **Factual sufficiency of evidence to show intent to cause death**

In his final point, Appellant argues that the evidence is factually insufficient to support the jury's finding that he intended to cause the victim's death.

a. **Standard of review**

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder's determination is manifestly unjust. *Watson*, 204 S.W.3d at 414–15, 417; *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). To reverse under the second ground, we must determine, with some objective basis in the record, that the great

20

weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction." *Id*. We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in the evidence. *Id*. We may not simply substitute our judgment for the fact-finder's. *Johnson*, 23 S.W.3d at 12; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence because resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Johnson*, 23 S.W.3d at 8. Thus, we must give due deference to the fact-finder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Id*. at 9.

An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant's complaint

21

on appeal. *Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003). Moreover, an opinion reversing and remanding on factual insufficiency grounds must detail all the evidence and clearly state why the finding in question is factually insufficient and under which ground. *Goodman v. State*, 66 S.W.3d 283, 287 (Tex. Crim. App. 2001); *Johnson*, 23 S.W.3d at 7.

### b. Discussion

Appellant spends several pages of his brief discussing two Supreme Court cases—*Ring* and *Apprendi*—apparently in an effort to show that the indictment in this case was deficient. *See Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428 (2002); *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000). *Ring* and *Apprendi* hold that certain facts must be alleged by the State and found by the jury beyond a reasonable doubt before punishment may be increased beyond the statutory maximum for the crime for which the jury found the defendant guilty. *Ring*, 536 U.S. 584, 609, 122 S. Ct. 2428, 2443 (declaring unconstitutional an Arizona law that enhanced life imprisonment to death sentence upon certain findings made solely by a judge and not a jury); *Apprendi,* 530 U.S. 466, 490–92, 120 S. Ct. 2348, 2363–64 (declaring unconstitutional a New Jersey law that enhanced punishment upon judge-made findings).

*Ring*, *Apprendi*, and their progeny are simply inapplicable to this case. The indictment alleged that Appellant intentionally caused the victim's death by shooting him with a firearm during the course of committing or attempting to commit a robbery. The court's charge tracked the indictment's language. Both the indictment and the charge set out the essential elements of capital murder. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1) (Vernon 2003), 19.03(a)(2) (Vernon Supp. 2007). The jury found those elements beyond a reasonable doubt. The statutory maximum—and mandatory—punishment for capital murder when the State waives the death penalty is life imprisonment without parole. *Id.* §§ 12.31(a) (Vernon Supp. 2007), 19.03(b). Thus, the indictment alleged, and the jury found, all of the elements necessary to impose a mandatory life sentence, and the concerns addressed by *Ring* and *Apprendi* play no role in this case.

We turn now to the evidence that touches upon Appellant's intent to cause the victim's death. In addition to the evidence recounted earlier in this opinion, the following evidence is relevant to intent. Appellant presented the testimony of Max Courtney, a forensic consultant. Courtney testified that—based largely on the security camera's depiction of the killing—Appellant's shooting the victim was "consistent with a sympathetic trigger pull." He explained that sympathetic trigger pull occurs when a person

23

who has their finger on a gun's trigger accidentally pulls the trigger in response to an external stimulus such as "stress, [a] sudden shocking event, a bump, a distraction, or whatever." Courtney testified that the facts that Appellant apparently shot himself in the foot during the attempted robbery, which presumably was accidental and possibly another sympathetic trigger pull;[4] was wearing gloves (which decreased his trigger finger's sensitivity); was looking away from the victim when he fired the fatal shot; and killed the victim when the victim might have opened the cash register for the robbers all support the possibility of sympathetic trigger pull. He agreed with Jamie Becker that the force needed to pull the gun's trigger was within the average range for the model of gun and that it could not be characterized as a "light trigger pull."

To summarize, before the jury was evidence that Appellant entered the Fina station with the intent to commit robbery; carried a single-action pistol of normal trigger-pull that he knew to be loaded; cocked the hammer; pulled the trigger and shot himself in the foot, presumably on accident; cocked the hammer again; held the pistol close to the victim's head, at times so close that

---

[4] The security video does not show Appellant shooting himself in the foot. A chipped tile and bullet fragments found in the store suggest that he shot himself while inside the store. And because Appellant fled the store immediately after shooting the victim, he must have shot himself in the foot before he shot the victim.

the barrel visibly moved the victim's hair; pulled the trigger a second time with the muzzle within two inches of the victim's head, killing the victim; and immediately sprinted out of the store before the victim's body hit the floor. Also before the jury was Courtney's testimony that the fatal shot was "consistent with sympathetic trigger pull."

Considering all of the evidence in a neutral light, we cannot say that the evidence supporting the jury's finding that Appellant intended to cause the victim's death is so weak or so greatly outweighed by the conflicting evidence that the jury's determination is clearly wrong and manifestly unjust. Thus, the evidence is factually sufficient to support the finding that Appellant intended to cause the victim's death. *See Watson*, 204 S.W.3d at 414–15, 417. We overrule Appellant's third point.

## Conclusion

Having overruled all of Appellant's points, we affirm the trial court's judgment.


ANNE GARDNER
JUSTICE

PANEL B:   LIVINGSTON, HOLMAN, and GARDNER, JJ.

DO NOT PUBLISH
TEX. R. APP. P. 47.2(b)

DELIVERED:  June 26, 2008

25