**Opinion filed July 31, 2014**



In The

# Eleventh Court of Appeals

_____

## No. 11-12-00213-CR
_____

**BOBBY DEAN BROWN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 91st District Court**
**Eastland County, Texas**
**Trial Court Cause No. 22675**

### M E M O R A N D U M   O P I N I O N

Bobby Dean Brown appeals his conviction for the offense of possession of less than one gram of methamphetamine. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115(b) (West 2010). The jury assessed punishment at confinement for two years in a state jail facility and a fine of $10,000. The trial court sentenced him accordingly. In four points of error, Appellant complains of jury charge error, two instances directed at the inadmissibility of expert witness testimony, and the denial of his motion for new trial. We affirm.

On the date of the offense, Appellant was at the home of his friend Rhonda McWhorter. McWhorter was on community supervision, and she had missed her monthly supervision appointment that day. McWhorter's supervision officer and David Cherry, the director of adult probation in Eastland County, were looking for McWhorter. Cherry called Deputy Benjamin Yarbrough with the Eastland County Sheriff's Department, and Deputy Yarbrough called Texas Department of Public Safety Trooper Tim Pitts. Deputy Yarbrough and Trooper Pitts went with the supervision officers to look for McWhorter.

When they arrived, Appellant and McWhorter were sitting in Appellant's pickup outside of McWhorter's home. Appellant and McWhorter got out of Appellant's pickup. McWhorter was taken to one of the patrol cars while Trooper Pitts began talking to Appellant. Trooper Pitts, Deputy Yarbrough, and Cherry all testified that Appellant consented to a search of his pickup. In the subsequent search, Trooper Pitts found a glass pipe in the glove compartment, and it had a white powdery coating indicating that it had been used to smoke methamphetamine. Although the pipe was found in his pickup, Appellant was not taken to jail because he had recently been in a motorcycle accident, had open sores on his body, and also had a staph infection. He was issued a ticket for possession of drug paraphernalia. Deputy Yarbrough had the contents of the pipe tested. A chemist from the DPS crime laboratory testified that he tested the substance using a Gas Chromatograph Mass Spectrometer (GCMS) and that it tested positive for the presence of methamphetamine. The jury found Appellant guilty of possession of less than one gram of methamphetamine. This appeal followed.

In his first point, Appellant contends that the trial court erred when it refused to give an Article 38.23 instruction because there was a fact issue about whether Appellant consented to the search of his pickup. *See* TEX. CODE CRIM. PROC. ANN. art. 38.23 (West 2005).

2

When a fact issue arises at trial regarding how evidence was obtained, Article 38.23 requires the trial court to instruct the jury to disregard the evidence if the jury believes that the evidence was obtained in violation of the Constitution or laws of the United States or of Texas. *Id.* To be entitled to such an instruction, "(1) [t]he evidence heard by the jury must raise an issue of fact; (2) [t]he evidence on that fact must be affirmatively contested; and (3) [t]hat contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the evidence." *Madden v. State*, 242 S.W.3d 504, 510 (Tex. Crim. App. 2007). "The defendant must offer evidence that, if credited, would create a reasonable doubt as to a specific factual matter" that is essential to the admissibility of the statement. *Oursbourn v. State*, 259 S.W.3d 159, 177 (Tex. Crim. App. 2008) (citing *Madden*, 242 S.W.3d at 510). "This factual dispute can be raised only by affirmative evidence, not by mere cross-examination questions or argument." *Id.* (citing *Madden*, 242 S.W.3d at 513 nn.22–23).

Appellant's challenge to the evidence as it relates to actual consent is two-fold. First, Appellant argues that there is a dispute about whether Appellant actually consented to the search because McWhorter testified that she did not believe that consent was obtained. Appellant contends that this conflicts with Trooper Pitts's testimony that Appellant gave him consent. Similarly, Appellant argues that "McWhorter's testimony on direct and re-direct created a fact issue" because "McWhorter admitted to not being present" during the conversations after testifying on direct examination that she did not hear Trooper Pitts request consent.

Appellant cites to *Espericueta v. State*, 838 S.W.2d 880 (Tex. App.—Corpus Christi 1992, no pet.), to support his proposition that a witness who "testifies one way on direct and another way on cross" raises a fact issue. In *Espericueta*, the defendant was asked on cross-examination whether he saw a double line when he passed a vehicle, to which he said, "I don't remember seeing the double line." *Id.*

3

at 883. On redirect examination, however, the defendant testified that he had not committed a violation before the traffic stop. *Id.* The court concluded that the evidence conflicted because the defendant "initially testified that he did not know if he violated the law," but on redirect, "testified that he committed no violations." *Id.*

Here, on direct examination, McWhorter testified:

Q    Okay. When you were there, did you ever hear Trooper Pitts ask for consent to search?

A    No, sir.

Q    Okay. Now, there was a brief time -- Were you taken away and did not hear that entire conversation?

A    Yes, sir, but I believe they were already searching as I was being taken over to the other vehicle.

Q    Okay.

A    And I never heard any consent on them, and never asked any -- or heard anyone ask for permission.

Q    So, based on your perception, did it appear that they at any time requested to search?

A    No, sir.

Q    Okay. So, to you, it just appeared that they started searching?

A    Yes.

On cross-examination, McWhorter testified:

Q    So, isn't it true there was a period of that you couldn't hear what was going on?

A    Yes, ma'am, that's true.

4

Q	And so, you couldn't testify -- you can't tell the jury that you heard anything that was going on?

A	No.

Q	Do you know whether the troopers asked for consent or not?

A	I just never heard them ask. I don't have any idea.

Q	So, they very easily could have?

A	Yes, ma'am.

On redirect, defense counsel asked McWhorter to explain the circumstances that led her to believe that consent was not requested, and she said, "Just that it happened so quickly that they started searching the vehicle. It didn't appear that they had enough time to ask for consent, and for consent to be given." McWhorter's testimony was that she did not hear anyone ask for or give consent. She did not change her testimony on cross-examination. Thus, there were no conflicts in McWhorter's testimony that created a fact issue about whether Appellant consented to the search.

Additionally, there is no conflict between McWhorter's testimony and that of Cherry, Trooper Pitts, and Deputy Yarbrough. Cherry, Trooper Pitts, and Deputy Yarbrough each testified that Appellant gave consent to Trooper Pitts to search the vehicle. McWhorter testified that she did not believe consent was granted because the search happened so quickly, that she did not hear Trooper Pitts request consent, that she did not hear Appellant give consent, and that she did not know whether Trooper Pitts asked for consent but that he could have. No one testified that Appellant refused consent, that they heard Appellant refuse consent, or that Appellant questioned why the officers were searching his vehicle.

5

McWhorter's testimony was not affirmative evidence that created a reasonable doubt that Appellant consented to the search.

Second, Appellant argues in the alternative that, if he consented to the search, his consent was not voluntary. Consent must be freely and voluntarily given. *Johnson v. State*, 803 S.W.2d 272, 286 (Tex. Crim. App. 1990). Whether consent to search was voluntary or the product of duress or coercion is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *Juarez v. State*, 758 S.W.2d 772, 775 (Tex. Crim. App. 1988). "[I]t is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced." *Schneckloth*, 412 U.S. at 233. The State has the burden to show that consent was voluntary. *Paprskar v. State*, 484 S.W.2d 731, 737 (Tex. Crim. App. 1972).

Appellant directs us to Carla Fox's testimony and argues that her testimony created a fact issue about whether Appellant was "in a good decision making capacity" at the time of his encounter with police. Fox testified that Appellant was taking hydrocodone for the injuries he suffered in the accident, that he seemed altered mentally, that he had problems remembering things, and that he did not have good judgment. There is no evidence disputing that Appellant was taking prescription medication prior to his encounter with police.

Although the record reveals that Fox cared for Appellant after his motorcycle accident, Fox testified that she had been in jail for three days at the time of the encounter. Thus, Fox had no personal knowledge about whether Appellant took prescription medication that day or during the time that she was in jail, nor did she know about his ability to consent to the search on the day that it was conducted. Whether Appellant was medicated and did not have good judgment several days prior to the encounter is not determinative of whether

6

Appellant was capable of giving voluntary consent to the search on the day of the encounter.

McWhorter testified that Appellant appeared to her to be fully functional. Yarbrough described Appellant's demeanor throughout the encounter as "[m]atter of fact." Trooper Pitts believed that he and Appellant were communicating, that Appellant understood the questions and answered them reasonably, that Appellant was aware of what was going on and why they were there, and that Appellant comprehended the situation.

In light of Trooper Pitts's testimony about Appellant's comprehension and ability to communicate and interact and McWhorter's testimony that he appeared to be fully functional on the day of the encounter, Fox's testimony regarding Appellant's condition several days before the encounter did not create a factual dispute that was material to the determination of whether his consent was voluntary on the date of the search. Appellant's first point is overruled.

In his second and third points, Appellant challenges the admissibility of certain expert testimony and exhibits. We review a trial court's determination that a witness is qualified as an expert and its ruling on the admission of expert testimony for an abuse of discretion. *Ellison v. State*, 201 S.W.3d 714, 723 (Tex. Crim. App. 2006). "Absent a clear abuse of that discretion," we will not disturb the trial court's decision to admit or exclude testimony. *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000).

The trial court may admit the testimony of an expert "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. Thus, to be admissible, the proponent of expert testimony must establish by clear and convincing evidence the following three conditions: "(1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the

7

subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case." *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006).

In his second point, Appellant argues that Trooper Pitts and Deputy Yarbrough were not qualified "to testify to the State's inability to obtain fingerprints or DNA evidence from the pipe found in Appellant's truck."

"The party proffering the expert witness bears the burden of showing that the witness is qualified on the specific matter in question." *Penry v. State*, 903 S.W.2d 715, 762 (Tex. Crim. App. 1995). We must review the trial court's ruling in light of the evidence before the court at the time of the ruling. *Rodgers*, 205 S.W.3d at 528–29. "The special knowledge which qualifies a witness to give an expert opinion may be derived from specialized education, practical experience, a study of technical works, or a varying combination of these things." *Penry*, 903 S.W.2d at 762. "Because the possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case." *Rodgers*, 205 S.W.3d at 527–28.

In *Acevedo*, when the investigator testified that "[n]o latent prints evidence suitable for identification [was] developed," the defendant objected to the investigator's qualifications as an expert. *Acevedo v. State*, 255 S.W.3d 162, 171 (Tex. App.—San Antonio 2008, pet. ref'd) (alterations in original). The investigator received training at the academy and took "an in-service class on identifying fingerprints." *Id.* The investigator explained that he had lifted latent prints from crime scenes "[s]everal hundred times." *Id.* The court concluded that the investigator's "testimony exhibited his training and experience with regard to collecting fingerprint evidence" and held that it was not an abuse of discretion to allow him to testify about "why a particular individual may not leave suitable

8

prints" because he was "trained and experienced in lifting latent fingerprints." *Id.* at 171–72.

Trooper Pitts described the pipe that was found in Appellant's pickup as a glass pipe that "had methamphetamine residue on the inside, a white powdery coat that you could tell that somebody had been smoking methamphetamines using that pipe." Trooper Pitts testified that it was not reasonable to think that fingerprints or other DNA could be lifted from the pipe. The defense objected to Trooper Pitts's qualifications to explain why he did not think it was reasonable to obtain fingerprints or DNA from the pipe. Trooper Pitts testified that he had gone through the police academy eighteen years before and that he went through the DPS training academy seven years later when he became a trooper. He also received specialized training about methamphetamine and other controlled substances and had found methamphetamine in vehicles on many occasions. Trooper Pitts had also been to fingerprint schools. The trooper explained, "Fingerprints, you can pull fingerprints off of different surfaces, depending on what that surface is; but, a lot of times, like a meth pipe, when they smoke methamphetamines, it gets the residue on the outside of the pipe, which coats the pipe." Trooper Pitts further explained, "It would be like somebody having really oily hands and touching that stuff." As it related to "this meth pipe," Trooper Pitts stated that conditions were not "conducive to pulling fingerprints off of that."

When the State asked Deputy Yarbrough why he did not have the pipe tested for fingerprints, the defense objected to Deputy Yarbrough's qualifications to answer the question. Deputy Yarbrough testified that he had his basic peace officer certification, that he had specialized training regarding methamphetamine and other controlled substances, and that he had found methamphetamine in vehicles on many occasions. According to Deputy Yarbrough, fingerprints could not be lifted off the pipe. Deputy Yarbrough explained that there is a round part

9

where the methamphetamine is placed and that smoke travels through the pipe on the inside but also adheres to the outside of the pipe. On cross-examination, defense counsel questioned Deputy Yarbrough about why he had not tested the pipe for DNA, and he said, "Well, again, you're back to the breakdown of the DNA, same as fingerprints on the tube."

Deputy Yarbrough and Trooper Pitts testified about their training and experience with regard to collecting fingerprint evidence. *See Matson v. State*, 819 S.W.2d 839, 851 n.10 (Tex. Crim. App. 1991) ("A witness may be qualified by reason of knowledge, skill, experience, or training, regardless of its source."). Their testimony was limited to the types of surfaces that are not conducive to lifting fingerprints. As officers trained and experienced in lifting fingerprints, their area of expertise included what makes certain surfaces less suitable to lift fingerprints. Accordingly, we cannot conclude that the trial court abused its discretion when it admitted the testimony of Deputy Yarbrough and Trooper Pitts.

Even if there was error, we must conclude that any such error was harmless because Appellant admitted to possessing the pipe. The State elicited the officers' testimony to explain why it could not offer fingerprint or DNA evidence to connect Appellant to the pipe. Appellant entered a plea of guilty and paid a $565 fine for the paraphernalia ticket that he received in connection with the pipe. Any error that resulted from allowing the officers to testify about why they could not offer fingerprint testimony in order to directly connect the pipe to Appellant would have been rendered harmless in light of Appellant's admission by his plea of guilty to the possession-of-paraphernalia offense. Appellant's second point is overruled.

In his third point, Appellant contends that the trial court erred when it admitted the Drug Analysis Laboratory Report and allowed forensic scientist Raymond Arthur Waller, Jr. to testify about the results of that report because the State failed to first establish the reliability of the results.

10

To establish reliability, "(a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question." *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). Appellant challenges the application of the technique under the third prong. Appellant directs us to Waller's testimony where he could not tell the jury the date that the GCMS had been calibrated, the date that method blanks had last been run, the exact lowest point of the detection limits, or the signal-to-noise ratio and argues that the State failed to show that the scientific technique was properly applied in this case.

Appellant cites *Hernandez v. State*, 116 S.W.3d 26 (Tex. Crim. App. 2003) as "[a]lmost an identical situation." In *Hernandez*, the Court of Criminal Appeals concluded that there was "no other evidence or material in this trial record . . . that would support any finding of the scientific reliability of the ADx analyzer." 116 S.W.3d at 30. The State failed to carry its burden in *Hernandez* to establish the reliability of a new science. *Id.* at 30–31. *Hernandez* was decided because of lack of evidence to explain how or why the ADx analyzer was reliable for urinalysis and not whether it was properly applied on the occasion in question. *Id.* Appellant does not challenge the reliability of the GCMS but rather contends that the State "failed to establish that [Waller] or anyone else in [the] laboratory correctly applied [the] techniques" in this case.

The record reflects that Waller has a bachelor's of science degree in chemistry and, at the time of his testimony, had been employed by the Texas Department of Public Safety Crime Laboratory for more than fifteen years. In addition to testing, writing reports, testifying, and handling personnel matters, he is "the laboratory's quality manager." Waller ensures that all reports comply with the lab's operating guidelines and standard operating procedures. According to Waller, the GCMS that was used in this case is calibrated once a week. Waller

11

said, "I know it was calibrated, but I don't know the exact date." When asked about "the procedures for the calibration" using auto tune, Waller explained that he uses computer software and that "[j]ust a click of a mouse will let you auto tune the instrument." When asked whether he used "method blanks in the system" to test for the presence of contaminants, Waller said that "blanks are [run] once a quarter" in accordance with the laboratory's standard operating procedure. Waller did not know the date that method blanks were last used prior to the testing in this case.

Waller also testified that the detection limits are "well below a milligram strength." Waller did not know the exact number but said, "I just know it's well below a milligram strength." The lab report shows that 0.01 grams of methamphetamine were tested in this case. Waller also did not know the signal-to-noise ratio for this particular GCMS, but he explained that this "procedure was done with the validation of this piece of equipment." He explained that validation occurs when a new piece of equipment arrives at any DPS crime lab; a series of tests are conducted to ensure "that this instrument works, and it works properly." Waller also testified that the testing in this case was conducted according to laboratory policy at all stages of testing.

Appellant argued at trial that there was no evidence of calibration or method blanks and argues on appeal that "there is no reliability upon which the State can base its evidence." Although Waller did not know the exact date of calibration or when method blanks had been run, he is the laboratory control manager and testified that the proper methods of testing were applied at all stages of the testing process. While Waller did not know the signal-to-noise ratio, he testified that the machine went through the validation process when it arrived at the lab. Appellant complains that Waller "could not state how the instrument was calibrated other than by an auto tune with a mouse click," but Appellant did not ask Waller to

explain how the software program worked.  Given Waller's testimony, we cannot conclude that the trial court abused its discretion when it admitted the lab report and allowed Waller to testify to the results contained therein.  *See Ellison*, 201 S.W.3d at 723.  Accordingly, Appellant's third point is overruled.

In his fourth point, Appellant argues that the trial court erred when it denied his motion for new trial without first conducting a hearing.  Appellant's sentence was imposed on May 1, 2012.  Appellant's motion for new trial reflects a file stamp of May 31, 2012.  A "Certificate of Presentment," signed by Appellant's attorney, was attached to the motion.  In the certificate, Appellant's attorney certified that he had hand delivered the motion to the office of the trial court.  The motion was overruled by operation of law.

To preserve error from the denial of a motion for new trial, the motion must be presented to the trial court.  TEX. R. APP. P. 21.6; *Thompson v. State*, 243 S.W.3d 774, 776 (Tex. App.—Fort Worth 2007, pet. ref'd).  Presentment means that the defendant has given the trial court actual notice that he wants the trial court to hold an evidentiary hearing and rule on the motion.  *Carranza v. State*, 960 S.W.2d 76, 78 (Tex. Crim. App. 1998).  A defendant must provide actual notice and must show that the motion was actually delivered to the trial court or otherwise brought to its attention.  *Thompson*, 243 S.W.3d at 776.

Appellant did not show actual notice to the trial court because the "Certificate of Presentment" showed only that the motion was hand delivered to the trial court's office.  Such a certificate of presentment does not show presentment under the rule.  *See Hiatt v. State*, 319 S.W.3d 115, 122 (Tex. App.—San Antonio 2010, pet. ref'd); *Owens v. State*, 832 S.W.2d 109, 111–12 (Tex. App.—Dallas 1992, no pet.).  This is the case even when it is certified in the presentment certificate that the motion was presented to the trial court.  *Hiatt*, 319 S.W.3d at 122; *Owens*, 832 S.W.2d at 111.  Moreover, there is no evidence that

Appellant requested a hearing because Appellant did not request one in the motion or include an order for a setting. Because this record does not show that Appellant ever presented a motion for new trial that included a request for a hearing and because there is no showing that such a request was ever brought to the attention of the trial court, we cannot say that the trial court erred when it failed to hold a hearing on Appellant's motion for new trial prior to the motion being overruled by operation of law. *Rozell v. State*, 176 S.W.3d 228, 231 (Tex. Crim. App. 2005). Appellant's fourth point is overruled.

We affirm the judgment of the trial court.


JIM R. WRIGHT

CHIEF JUSTICE

July 31, 2014

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and McCall[1]


Bailey, J., not participating.

---

[1]Terry McCall, Retired Justice, Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.